IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JOE R. JENKINS,                          )
                                         )
            Plaintiff,                   )
                                         )
    v.                                   ) Civil Action No. 02-331-GMS
                                         )
RAPHAEL WILLIAMS, et al.,                )
                                         )
            Defendants.                  )

## MEMORANDUM

## I. INTRODUCTION

The plaintiff, Joe R. Jenkins ("Jenkins"), a prisoner incarcerated within the Delaware Department of Correction filed this lawsuit pursuant to 42 U.S.C. § 1983. At the time the complaint was filed, Jenkins appeared *pro se* and was granted leave to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915. He was later appointed counsel who filed a third amended complaint. (D.I. 64, 123.) Counts I and II of the third amended complaint, brought against the State defendants, raise a 42 U.S.C. § 1983 claim and an assault and battery claim. Count III is brought against the defendant Correctional Medical Services ("CMS") and raises and aiding and abetting claim.

Now before the court are the State defendants's motion for summary judgment and CMS' motion for summary judgment, Jenkins' response, and replies by the defendants. (D.I. 182, 183, 184, 195, 186, 188, 189, 190, 191, 192.) For the reasons that follow, the court will grant in part and deny in part the State defendants' motion for summary judgment and will grant CMS' motion for summary judgment.

## II. BACKGROUND

On October 14, 2001, Jenkins was incarcerated at the Howard R. Young Correctional Institution ("HRYCI"), Wilmington, Delaware.[1] Five days prior to his incarceration, Jenkins underwent arthropscopic knee surgery and was scheduled to undergo back surgery in November 2001. Jenkins had been prescribed medication for his medical conditions. Jenkins alleges that he was either denied or received substitute medication, medical care was unacceptable, and he was not allowed to engage in physical therapy. Also, his grievances were not addressed.

On February 19, 2002, Jenkins was called to receive his medication and, after learning from the nurse that his medication was unavailable, was ordered to lock-in his cell or a code would be called. The code was called, Jenkins returned to his cell and closed his door, and the Quick Response Team ("QRT") arrived. The QRT was under the command of the State defendant Michael Lewis ("Lewis") and was comprised of the State defendants Clint Yingling ("Yingling"), Timothy Buff ("Buff"), Givenchy Cerisier ("Cerisier"), Scott Austin ("Austin"), and Charzell Poole ("Poole"). Andrew Talenti ("Talenti") was present to video record the actions of the QRT.[2] Jenkins was extracted from his cell and taken to the infirmary for a medical check. Jenkins alleges that the QRT engaged in excessive force during the extraction, that certain defendants failed to intervene or stop the attack, and that following the extraction he

---

[1]Jenkins is currently incarcerated at the Delaware Correctional Center ("DCC"), Smyrna, Delaware.

[2]Talenti is no longer living and was not deposed prior to his death. A videotape was not produced in discovery. The record indicates that the QRT members believed that Talenti was video-taping their actions, but Talenti's report states there was not tape available. (D.I. 184, A286.) Ronald Thomas Talenti ("R. Talenti") is the personal representative of Talenti's estate and was substituted as a party defendant. (D.I. 140.)

received a cursory medical examination. The State defendants Charles Burrell ("Burrell"), Michael Miller ("Miller"), and Frankie Kearns ("Kearns") witnessed the extraction process. Following the medical examination, Jenkins was taken to the disciplinary housing unit (i.e., the hole) and alleges that, once there and while he was shackled and cuffed, Austin, Cerisier, Buff, Kearns, Lewis, Poole, Talenti, and Yingling beat, kicked, and taunted him. Disciplinary charges were filed against Jenkins. Jenkins alleges that while in the disciplinary housing unit, his repeated requests for grievance forms were denied until March 6, 2002. At that time, Jenkins was told that if he made mention of the February 19th incident, his grievance would not be filed.

While housed in the disciplinary housing unit Jenkins sought medical attention for injuries he sustained on February 19, 2002. On the day of the incident Jenkins showed his injuries to a nurse who provided him with sick call slip, but did not offer him any medical care. He filed a sick call slip that day, was seen by a nurse on February 25, 2002, and scheduled to see a physician the following month, but the visit did not take place "for months".

## III. STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Chimie v. PPG Indus. Inc.*, 402 F.3d 1371, 1376 (Fed. Cir. 2005). Thus, summary judgment is appropriate only if the party shows there are no genuine issues of material fact that would permit a reasonable jury to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it might affect the outcome of the suit. *Id.* at 247-48. An issue is genuine if a reasonable jury could possibly find in favor of

-3-

the non-moving party with regard to that issue. *Id.* at 249. The moving party bears the initial burden of demonstrating that there are no genuine issues of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Additionally, the evidence is to be viewed in the light most favorable to the nonmoving party, with all doubts resolved against entry of summary judgment. *Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 91 (3d Cir. 1999).

The mere existence of some evidence in support of the nonmoving party, however, will not be sufficient for denial of a motion for summary judgment; there must be enough evidence to enable a jury reasonably to find for the nonmoving party on that issue. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 249. If the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. at 322.

## IV.   DISCUSSION

### A. Defendants' Motions for Summary Judgment

The State defendants move for summary judgment on the bases that the third amended complaint fails to state a claim against Warden Raphael Williams ("Warden Williams") upon which the court can grant relief; the facts of the case fail to support the allegations of excessive force, failure to protect, and deliberate indifference; they are immune from suit under Delaware's State Tort Claims Act as there is no merit to the allegations of assault and battery; Jenkins failed to exhaust his available administrative remedies; and they have qualified immunity. CMS moves for summary judgment on the basis that there is no genuine issue as to any material fact and summary judgment is warranted in its favor. More particularly, CMS contends that Jenkins failed to satisfy the requirements of aiding and abetting and failed to exhaust his administrative

-4-

remedies.

**B. Claims Against Warden Williams**

The State defendants argue that Jenkins has neither specified an HRYCI policy that posed an unreasonable risk of harm nor identified an alternative that could have prevented the harm he alleges occurred and, thus, cannot demonstrate that Warden Williams is liable on a failure to train issue. The State defendants also move for summary judgment on the bases that Warden Williams had no personal involvement before, during, or after the February 19, 2002 incident, and he was not deliberately indifferent to Jenkins' plight.

Jenkins did not respond to that portion of the State defendants' motion seeking summary judgment on the failure to train issue. With regard to the issue of Warden Williams' alleged deliberate indifference, Jenkins argues that in the months leading up to February 19, 2002, he sent several letters to Warden Williams voicing his concerns about civil rights deprivations perpetrated by correctional officers at HRYCI. Jenkins contends that his last letter, dated February 13, 2002, expressed concerns about retribution from correctional officers. In this regard, Jenkins argues that Warden Williams was unquestionably exposed to the information. Finally, Jenkins argues that there is no evidence of any response or follow-up to his concerns expressed in the February 13, 2002, letter after it was forwarded to Captain Bradley Lee ("Lee"), one of the persons about whom he complained.

Jenkins has never met Warden Williams, but he has written him numerous letters. (D.I. 184, A46.) Jenkins named Warden Williams as a defendant "because he's directly responsible for the actions of the employees that caused them to do [Jenkins] harm . . . . [and he] is directly responsible for the actions of his guards. He has a policy that he's instituted that his guards

follow. He's directly responsible for what goes on. Not based upon his being the head of the prison, but based upon his actions, directing the actions of other people in his prison." (*Id.* at A46-47.)

Jenkins wrote a letter to Warden Williams dated December 7, 2001. (D.I. 184, A265-268.) The letter refers to correctional officer ("C/O") Salas and C/O King and raises issues regarding religion, grievances, and housing/classification. (*Id.*) Lee conducted an investigation at the direction of Warden Williams. (D.I. 191, ex. A.) On December 13, 2001, Lee issued a memorandum/report to Warden Williams. The three page report concluded that Jenkins' rights had not been violated. (*Id.*) As part of his investigation, Lee interviewed Jenkins, witnesses named by Jenkins, and correctional officers. (*Id.*) On the same date, Warden Williams authored a letter to Jenkins and advised him of Lee's findings. (D.I. 184, A269.)

Jenkins wrote a second letter to the Warden Williams dated January 27, 2002, and complained that he was not receiving his medication. (D.I. 184, A270-272.) Jenkins' letter was forwarded to the medical department for review and action. (*Id.* at A271.) Jenkins sent Warden Williams a third letter dated January 29, 2002, again raising medical and housing issues. (*Id.* at A272-274.) The letter was forwarded to medical. (*Id.* at A274.) Additionally, Jenkins was advised to discuss his issues with his counselor and with the medical unit. (*Id.* at A273-74.)

Next, on February 13, 2002, Jenkins wrote to Warden Williams and complained that officers were attempting to illegally cause him harm. (*Id.* at A275.) The letter states that C/O Seymour ("Seymour") called him names and, as a result, Jenkins wrote to Lee and also filed a formal grievance. (*Id.*) Lee advised Jenkins it was a non-grievable issue and issued a disciplinary report to Jenkins for "disrespect" because in his grievance Jenkins had referred to

-6-

Seymour as a "blatant homosexual." (*Id.*) Jenkins complained that Lee issued the disciplinary report in retribution for the grievance and that night, for no reason, he was locked in his cell by Lee. (*Id.*) A notation on the letter indicates that it was referred to Lee for information and action. (*Id.*) Warden Williams did not recall receiving a report from Lee regarding this letter. (D.I. 184, A234.) Six days later, on February 19, 2002, Jenkins was extracted from his cell by the QRT.

Jenkins submitted grievances, both medical and non-medical subsequent to February 19, 2002. Medical grievances are normally handled by the medical department. (D.I. 184, A135-36.) The first grievance, a medical grievance, was submitted on February 19, 2002. (D.I. 184, A289.) Jenkins complained of pain and an assault by the C/Os. (*Id.*) A response, dated February 26, 2002, notes that Jenkins was on medication for back pain, was examined, and scheduled to see a physician "next month." (*Id.*) A grievance dated March 6, 2002, No. 2946, complained that Jenkins had finished his disciplinary sanction but continued to be punished.[3] (*Id.* at A290.) The grievance was returned as non-grievable, but noted that Jenkins was moved to a different unit. (*Id.* at A291.) A March 10, 2002 grievance, No. 2963, complained of an assault by the QRT on February 19, 2002, and lack of medical attention. (*Id.* at A292.) In his grievance, Jenkins states that he was unable to file a grievance because he was in the hole and the C/Os would not give him a grievance form. (*Id.* at A292.) A medical grievance on the same date, No. 02-103, referred to the assault, requested treatment for his injuries, and requested the names of the C/Os on the QRT. (*Id.* at A293.) Although grievance 02-103, was returned as untimely, Jenkins was advised on March 11, 2002, that the matter would be forwarded to the Office of the

---

[3]He does not complain of an assault by C/Os.

Security Superintendent, Major Phelps ("Phelps') and the medical department for review and any action deemed necessary. (*Id.* at A295.) On March 14, 2002, Phelps authored a memorandum for grievance No. 2963, stated that he had reviewed the matter, found no indication of excessive use of force, and advised Jenkins to submit a sick call slip if he had a medical issue. (*Id.* at A296.)

As is well established, supervisory liability cannot be imposed under § 1983 on a respondeat superior theory. *See Monell v. Department of Social Services,* 436 U.S. 658 (1978); *Rizzo v. Goode* 423 U.S. 362 (1976). "'A[n individual government] defendant in a civil rights action must have personal involvement in the alleged wrongdoing; liability cannot be predicated solely on the operation of respondeat superior.'" *Evancho v. Fisher,*423 F.3d 347, 353 (3d Cir.2005) (quoting *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988). Personal involvement can be shown through allegations that a defendant directed, had actual knowledge of, or acquiesced in, the deprivation of a plaintiff's constitutional rights. *Id.; see Monell,* 436 U.S. at 694-95. Supervisory liability may attach if the supervisor implemented deficient policies and was deliberately indifferent to the resulting risk, or the supervisor's actions and inactions were "the moving force" behind the harm suffered by the plaintiff. *Sample v. Diecks,* 885 F.2d 1099, 1117-118 (3d Cir. 1989); *see also City of Canton v. Harris,* 489 U .S. 378 (1989); *Heggenmiller v. Edna Mahan Corr. Inst. for Women,* 128 Fed. Appx. 240 (3d Cir. 2005).

As previously noted, Jenkins did not respond to the failure to train issue. Also, nothing before the court indicates that Warden Williams was present at the time of the February 19, 2002 incident or that he directed the QRT to take any action on that date. Accordingly, the court turns to the issue of whether Warden Williams, on the basis of his supervisory position, was

deliberately indifferent to Jenkins' plight.

Supervisory liability presents the question of whether Warden Williams was "the moving force behind" the alleged constitutional tort. *Sample*, 885 F.2d at 1116-1117. To succeed on a claim against Warden Williams based on prison policy or practices, Jenkins must identify a specific policy or practice that the supervisor failed to employ and show that: (1) the existing policy or practice created an unreasonable risk of the Eighth Amendment injury; (2) the supervisor was aware that the unreasonable risk was created; (3) the supervisor was indifferent to that risk; and (4) the injury resulted from the policy or practice. *Id.* at 1118.

The record indicates that prior to February 19, 2002, Warden Williams did not ignore Jenkins' letters. Indeed, action was taken on each letter, either through an investigation or the forwarding of the letter to appropriate personnel. At no time prior to February 19th did Jenkins indicate that he had been threatened with physical harm by any correctional officer. Instead he complains of "retribution." Jenkins relies heavily upon his last letter to argue that this letter placed Warden Williams on notice of a danger of attack, but he did nothing. To the contrary, the record reflects that the matter was referred to Lee. Unfortunately, Warden Williams did not remember the outcome of that referral. Nonetheless, the record does not indicate that Warden Williams ignored the letter. Notably, neither Lee nor Seymour were members of the QRT who extracted Jenkins from his cell on February 19, 2002. Nor were they present at any time.[4] Finally, the record reflects that medical issues are routinely referred to the medical unit and that Jenkins received medical treatment subsequent to the events of February 19, 2002, albeit not to his liking.

_____

[4]They are not named defendants.

-9-

The record does not support a finding that Warden Williams was the driving force behind Jenkins alleged violations, and does not support a finding that Warden Williams was aware of Jenkins' complaints and remained "deliberately indifferent" to his plight. Based upon the foregoing, the court will grant the State defendants' motion for summary judgment as to the claims raised against Warden Williams.

## C. Count I, 42 U.S.C. § 1983

The State defendants argue that the facts of the case do not support Jenkins' bald allegations of excessive force, failure to protect, and deliberate indifference and, therefore, they are entitled to summary judgment. The record indicates that on the morning of February 19, 2002, Miller ordered Jenkins to lock in his cell after Jenkins did not receive his medication from the nurse. (D.I. 184, A126). Jenkins and Miller had a short discussion over Jenkins' need for the medication and Miller again told Jenkins he would have to lock in or Miller would call a code on him. (*Id.* at A49, A126.) Jenkins stood there for about ten second and then Miller called a Code 6 on the basis that Jenkins had refused to lock in.[5] (*Id.* at A49.) After a few minutes Burrell arrived at Jenkins' cell, and Jenkins explained what had happened. (*Id.* at 50.) Burrell left and returned to tell Jenkins that he could not help him because the QRT was coming. (*Id.*)

Lewis, the QRT leader, and the QRT members, Austin, Yingling, Cerisier, Buff, and Poole responded to the code. (*Id.* at A141-A142.) Lewis, who had been briefed, approached Jenkins' cell and spoke to him through the door. (*Id.* at A142.) According to Lewis, Jenkins was irate and cursing, so he left Jenkins' cell door and returned with the QRT. (*Id.* at A142.) At this

---

[5]A Code 6 is a code called for an inmate's refusal to lock in. (D.I. 184, A137.) Calling a Code 6 alerts those officers who are on the QRT that they must respond to the housing area and the code. (*Id.*)

time, Lewis ordered Jenkins to his knees. (*Id.* at A143.) Jenkins explained that he was unable to kneel due to recently knee surgery. (*Id.* at A51.) Jenkins pointed to his knee immobilizer which lay on the cell floor and to his bandaged knee. (*Id.*) He was asked to kneel twice, and each time Jenkins stated he could not. (*Id.* at A52.) Lewis testified that Jenkins did not mention that he had a knee problem. (*Id.* at A143.) Jenkins' cellmate, Richard Helms ("Helms") testified that both times Jenkins refused the command to go to his knees. (*Id.* at A171.) Next, Lewis ordered the QRT to enter the cell and extract Jenkins and "all hell broke loose." (*Id.* at A52, A143, A171.) Helms recalled that Jenkins was "bracing himself." (*Id.* at A172.)

The QRT entered Jenkins' cell, and the members of the QRT attempted to secure his assigned body part. (*Id.* at A144.) Jenkins was trying to stop the QRT from handcuffing him or taking him out of the cell, and he tried to hold his ground. (*Id.*) Jenkins was knocked to the floor. (*Id.* at A53.) Jenkins testified that during this time he was taking a beating. (*Id.*) He told the QRT members they were injuring his knee and asked them to stop hurting him. (*Id.* at A54.) Jenkins was wrestling, and did "whatever he could" to prevent the QRT from extracting him from his cell. (*Id.* at A173.) According to Helms, the QRT was there to do a job and it was business as usual. (*Id.* at A173.) Jenkins was pulled backwards from the cell, face up. (*Id.* at A56.)

Once he was removed from the cell, Jenkins was placed into a kneeling position. (*Id.* at A56, 105. ) Jenkins was ordered to walk, but did not respond because he could not talk. (*Id.* at A56-A57.) He was carried face down by the QRT. (*Id.*) According to the State defendants, after Jenkins was removed from the cell he continued to refuse to cooperate and told members of the QRT that they would have to carry him. (*Id.* at A279-A286.)

-11-

Jenkins was carried off the tier, to the infirmary for examination, before going to the disciplinary housing unit. (*Id.* at A58; D.I. 190, B145.) According to Lewis, Jenkins, continued to be combative. (D.I. 184, A150.) While going down the hall, the QRT performed two "team rests"[6] on Jenkins. (*Id.* at A150-A151.) Team rests are performed when "an individual [is] being uncooperative [and] being disorderly". (*Id.* at A150.) It is described as "almost like a football tackle." (D.I. 190, B26.)

After the team rests, the QRT carried Jenkins into the infirmary. (D.I. 184, A57.) He was placed on the floor, face down, and then placed in a kneeling position. (*Id.* at A57.) Jenkins was examined by Dr. Michael Baako ("Dr. Baako"). (*Id.* at A187-A189.) Jenkins complained to Dr. Baako that his head, knee, wrist, back, and face had been hurt. (*Id.* at A58.) Examination revealed no injuries, no bruising and no swelling, but there was a small abrasion at the distal forearm. (*Id.* at A188-A189.) The examination took less than five minutes. (*Id.* at A59, A152.) Dr. Baako told Lewis that Jenkins was "okay" and could be taken to administrative segregation. (*Id.* at A58.)

Next, the QRT members, as well as Lewis, Talenti, and Kearns escorted Jenkins to the 1E pod of the disciplinary housing unit. (*Id.* at A152; A59.) One must pass through an alcove or foyer area to enter the 1E pod area. (*Id.* at A152.) At that point there is a set of interlocking doors. (*Id.* at A153.) One door must be closed before the next one can be opened. (*Id.*) Poole, Cerisier, Buff, Yingling, Austin, Lewis, Kearns, and Talenti entered the alcove between the doors

---

[6] Lewis explained that a team rest is where "you take the person, you lay him down, lay on top of him until all the fight comes out of him." (Lewis dep. *Id.* at 73:17-19).

and the light was turned off.[7] (*Id.*) Lewis testified that once inside the alcove Jenkins continued to be verbally and physically combative and this required the QRT to perform another team rest. (*Id.* at A153.) Jenkins testified that while in the alcove, and while cuffed, shackled, and face down, he was beaten and kicked for one to two minutes. (*Id* at A59.) He testified that Lewis and Kearns taunted him, Lewis told him to shut up, and said something like "you [were] tough a minute ago. You are going to cry now." (*Id.* at A60.)

## 1. Excessive Force

Whenever a plaintiff claims that a prison official used excessive physical force, thus violating the cruel and unusual punishment clause, "the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6-7 (1992). Jenkins does not have to demonstrate serious injury, although the extent of injuries suffered is a factor in determining whether the use of force was necessary or not. *Hudson,* 503 U.S. at 7. *See also Brooks v. Kyler,* 204 F.3d 102, 104 (3d Cir. 2000) (holding that there is no fixed minimum quantum of injury that a prisoner must prove he suffered through either objective or independent evidence in order to state a claim for excessive force). Other factors considered in determining whether the use of force was wanton and unnecessary include "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Hudson,* 503 U.S. at 7 (quoting *Whitley v. Albers,* 475 U.S. 312, 321 (1986).

---

[7]The lights are controlled by an officer from inside, looking into the foyer. (D.I. 184, A153.)

The State defendants argue that force was used only when it became evident that Jenkins refused to obey orders and to cooperate, that they only used the amount of force necessary to extract Jenkins from his cell, and that any injuries sustained by Jenkins resulted from his conduct. They further argue that Jenkins' refusal to obey orders threatened the safety and security of HYRCI, its staff and inmates. Finally, they argue that Jenkins was provided medical care, during and after the cell extraction, in an attempt to temper the severity of the situation. Conversely, Jenkins contends that a jury could conclude that the QRT engaged in excessive force and, therefore, summary judgment should be denied.

The court turns first to the events leading up to the extraction, the extraction itself, the trip to the infirmary and up to the entrance of the 1E pod. Considering the factors outlined in *Hudson*, Jenkins has not shown that he can survive summary judgment on the excessive force claim as to those events. Jenkins' medical records indicate that his injuries were relatively minimal, and he admits to the basic facts relating to the calling of the code and his resistance to the QRT's forcible extraction from his cell. For example, putting aside his medical condition, he acknowledges that he did not obey the command to kneel. Additionally, his cellmate testified that Jenkins did not obey the QRT's commands, "braced" himself for the QRT, was wrestling, and did "whatever he could" to prevent the QRT from extracting him from his cell. The cellmate also testified that the QRT was there to do a job and it was business as usual.

Jenkins posits a theory that, because he called Seymour a homosexual, the QRT retaliated against him. This theory, however, is not borne out by the record. There is no evidence to link Seymour or Lee, who investigated the matter, to Jenkins' refusal to return to his cell, the calling of the code, or the QRT cell extraction. Notably, nothing in the record indicates that either

-14-

Seymour or Lee were in the area at the time of the events of February 19, 2002.

In sum, Jenkins has not presented evidence that would establish an issue of material fact on whether the QRT acted to "maliciously and sadistically cause harm" to him. *Hudson,* 503 U.S. at 7. Instead, the evidence establishes that Jenkins, both verbally defied and physically, resisted the officers throughout the encounter. Therefore, a reasonable factfinder could not conclude that the actions of the officers were anything other than a "good faith effort to maintain or restore discipline" and were not cruel and unusual punishment. *Id.* at 7. Accordingly, the court finds that Lewis, Yingling, Buff, Cerisier, Austin, and Poole are entitled to summary judgment for the acts leading the events leading up to the extraction, the extraction itself, the trip to the infirmary and up to the entrance of the 1E pod of the disciplinary housing unit.

In dispute, however, is whether the State defendants engaged in excessive force once they were inside the alcove going to the 1E pod of the disciplinary housing unit (hereafter "1E pod incident"). Jenkins testified that in the alcove, and while cuffed, shackled, and face down, someone turned off the light, and he was beaten and kicked for one to two minutes. Those present were Lewis, Yingling, Buff, Cerisier, Austin, Poole, Kearns, and Talenti. Conversely, Lewis testified that once inside the alcove Jenkins continued to be verbally and physically combative requiring the QRT to perform another team rest. (*Id.* at A153.) It is clear from the record that there remains a factual dispute, in which the credibility of witnesses likely will be determinative of the issue. Accordingly, because there are genuine issues of material fact, the court will deny summary judgment on the issue of excessive force for the actions that took place during the 1E pod incident. *See e.g., Groman v. Township of Manalapan*, 47 F.3d 628, 633 (3d Cir. 1995) (reversing summary judgment on an excessive force claim where testimonies by the

-15-

plaintiff and police officers differed).

## 2. Failure to Intervene

The State defendants contend that the record does not support Jenkins' claim of failure to protect. They posit that the QRT used the minimum amount of reasonable force necessary to restrain Jenkins, extract him from his cell, and escort him to the infirmary and administrative segregation. Finally, the State defendants contend that the record fails to show that the QRT posed a substantial risk of serious harm to Jenkins or that the State defendants were aware of a substantial risk of harm to him. Jenkins responds that his claim comes under the theory of failure to intervene, not failure to protect. He contends that Lewis or Kerns could have ordered the QRT to stop. Similarly, he argues that Lewis, Kerns, Talenti, Miller, and Burrell witnessed the attack, but declined to intervene in any fashion in spite of the State defendants inappropriate use of force.

"[A] corrections officer's failure to intervene in a beating can be the basis of liability for an Eighth Amendment violation under § 1983 if the corrections officer had a reasonable opportunity to intervene and simply refused to do so." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). However, "an officer is only liable if there is a realistic and reasonable opportunity to intervene." *Id.* at 651 (citing *Putman v. Gerloff*, 639 F.2d 415, 423-24 (8th Cir. 1981) (liability exists only if the non-intervening officer saw the beating or had time to reach the offending officer)) (other citations omitted). Even where a defendant is an offending officer's superior, if the defendant failed to act when he had a "realistic and reasonable opportunity" to do so, a plaintiff may prevail on an Eighth Amendment claim. *See id*; *Cuciak v. Hutler*, Civ. No. 05-1121, 2005 WL 1140690, at *3 (D.N.J. May 13, 2005).

-16-

For the reasons discussed above, in the section on excessive force, the court will grant summary judgment to the State defendants Lewis, R. Talenti, Miller, Burrell, and Kearns on the failure to intervene issue as to the claims revolving around the events leading up to the extraction, the extraction itself, the trip to the infirmary and up to the entrance of the 1E pod. Similarly, for the reasons previously discussed, the court will deny the State defendants Lewis, Yingling, Buff, Cerisier, Austin, Poole, Kearns, and R. Talenti summary judgment for the failure to intervene during the 1E pod incident. There are genuine issues of material fact as to that claim.

### 3. Deliberate Indifference

The State defendants move for summary judgment on the basis that the record demonstrates that Jenkins was provided with medical care before, during, and after the February 19, 2002 incident. Jenkins argues that after he was placed in the hole he sought medical attention, but it was eight days before he was examined, and CMS did nothing in response to his allegation that he had been injured by the correctional officers.

In order to prevail in a medical needs claim, an inmate must prove he has (i) a serious medical need and (ii) acts or omissions by prison officials that indicate deliberate indifference to that need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A prison official is deliberately indifferent if he knows that a prisoner faces a substantial risk of serious harm and fails to take reasonable steps to avoid the harm. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). A prison official may manifest deliberate indifference by "intentionally denying or delaying access to medical care." *Estelle v. Gamble*, 429 U.S. at 104-05. However, "a prisoner has no right to choose a specific form of medical treatment," so long as

-17-

the treatment provided is reasonable. *Harrison v. Barkley*, 219 F.3d 132, 138-140 (2d Cir. 2000).

The medical records indicate that after his arrival at the HRYCI Jenkins received medical care and medication on numerous occasions. (D.I. 184, A243-A264.) Granted, Jenkins had problems receiving his medication, but the record does not reflect that the State defendants were responsible for those problems. Prior to the February 19, 2002 occurrence, examination indicated that Jenkins' left knee had healed and he had good range of motion and no swelling, but Jenkins continued to complain of knee pain, back pain, and bilateral shoulder pain. (D.I. 184, A185-187.) Following the cell extraction, Jenkins was taken to the infirmary and examined by Dr. Baako. The notes from the examination indicate that Jenkins had a small abrasion to his forearm, but no bruises, no swelling and no bleeding. (*Id.* at A188-A189.) After submitting a request for medical attention on February 19, 2002, Jenkins was seen by a nurse eight days later. Jenkins did not submit any other requests for medical attention. (D.I. 184, A66.)

In addition to the foregoing, Jenkins' medical records indicate that he was seen by medical personnel repeatedly in October, November and December 2001, and on January 15, February 2, 7, 26, and May 28, 2002. (D.I. 186, exs. E, F, G.) Finally, exhibits submitted to the court indicate that, for the most part, Jenkins received responses to his requests for medical treatment. For example, on January 31, 2002, Jenkins complained of a knee and back problem and was seen on February 2, 2002; on February 19, 2002, he complained of pain following the cell extraction and he was seen on February 26, 2002, and scheduled to be seen by a physician; on April 14, 2002, he asked for, and received, a prescription refill; he made another medication request on May 2, 2002 and he was scheduled to see a physician; medications were reordered pursuant to a May 20, 2002 request; on May 27, 2002 he asked for medical attention and was

-18-

seen by a physician on May 28, 2002. (*Id.* at ex. G.)

Count I of the third amended complaint alleges the State defendants were deliberately indifferent to Jenkins' health or safety. (D.I. 123, ¶ 50.) Aside from this one statement in the third amended complaint, Jenkins' complaints regarding medical treatment, or the lack thereof, are directed at CMS, not the State defendants. Indeed, in his response to the State defendants' motion for summary judgment, Jenkins places the blame for delay or lack of medical care upon CMS. The third amended complaint, however, raises only an aiding and abetting claim, not a medical needs claim against CMS.

It appears that Jenkins relies upon the allegations in the third amended complaint and the actions or inactions of CMS to support his deliberate indifference claim. However, as is done here, a party opposing a summary judgment motion may not simply "rest upon mere allegations, general denials, or [] vague statements." *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir. 1991). Based upon the record before the court, a reasonable jury could not find that the State defendants were deliberately indifferent to Jenkins' health or safety. Accordingly, the court will grant the State defendants' motion for summary judgment on this issue.

**D. Qualified Immunity**

In addition to arguing that any force used was reasonable, the State defendants contend that they cannot be held liable in their individual capacities under the doctrine of qualified immunity. Government officials performing discretionary functions are immune from liability for civil damages when their conduct does "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The test for qualified immunity, outlined in *Saucier v. Katz*, 533 U.S.

194 (2001), is whether, taken in the light most favorable to the party alleging injury, 1) the facts show the officers' conduct violated a constitutional right, and 2) the constitutional right was clearly established, based on the specific context of the case. *Id.* at 201. The Third Circuit has interpreted the second step of this inquiry as follows: "If it would not have been clear to a reasonable officer what the law required under the facts alleged, he is entitled to qualified immunity." *Bennett v. Murphy*, 274 F.3d 133, 136-37 (3d Cir. 2002). "If the requirements of the law would have been clear, the officer must stand trial." *Id.* at 137.

The State defendants argue the evidence shows they performed their jobs in good faith without gross or wanton negligence and they used the minimum amount of reasonable force necessary to restrain Jenkins and transfer him to administrative segregation. At least as to the 1E pod incident, there is a genuine issue of material fact as to whether the force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm. Additionally, as to this last incident there is a genuine issue of material fact as to whether the state defendants failed to protect Jenkins from harm. Therefore, at this time, the court will deny the motion for summary judgment on the issue of qualified immunity.

### E. Count II, Assault and Battery

The State defendants contend that, as to Count II, they are immune from liability under the State Tort Claims Act, 10 Del. C. § 4001, because there is no merit to Jenkins' allegations of assault and battery. Jenkins argues that the record contains evidence upon which a jury could find in his favor on the issue of assault and battery.

Section 4001 exempts state employees from civil liability for their actions if their conduct (i) arose out of and in connection with the performance of an official duty which involved the

-20-

exercise of discretion, (ii) was undertaken in good faith and with the belief that the public interest would best be served by their actions, and (iii) was performed without gross or wanton negligence. 10 Del. C. § 4001. However, "[a]n employee may be personally liable for acts or omissions causing . . . bodily injury . . . but only for those acts which were not within the scope of employment or which were performed with wanton negligence or willful and malicious intent." 10 Del. C. § 4011(c).

The State defendants are entitled to immunity under the State Tort Claims Act with regard to the acts that took place during the extraction, the trip to the infirmary and up to the entrance of the 1E pod. The QRT members and Lewis were summoned after a Code 6 was called. The record indicates that they took the actions they did, for the safety and security of the prison, and in the performance of their official duties. Finally, as previously discussed, the record indicates that they performed the assigned tasks without violating Jenkins' constitutional rights.

As to the 1E pod incident, the facts are disputed as to whether State defendants acted in good faith and without gross or wanton negligence on February 19, 2002. Therefore, because there remain disputes of material fact, summary judgment on this issue must be denied.

### F. Administrative Remedies

The State defendants move for summary judgment on the basis that Jenkins failed to exhaust his administrative remedies.[8] Jenkins responds that his efforts to timely file a grievance were actively thwarted and, even if they had not been blocked, there was no remedy available for

---

[8]The court will not address that portion of CMS' motion for summary judgment on the basis that Jenkins failed to exhaust his administrative remedies inasmuch the court will grant it summary judgment on the issue of aiding and abetting.

his particular grievance. He further argues that, while untimely, he filed a grievance as soon as he could, and substantially complied with the administrative remedy scheme.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Porter v. Nussie*, 534 U.S. 516, 532 (2002) ("[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."). Failure to exhaust administrative remedies must be pled and proved by the defendant. *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002).

Under § 1997e(a), "an inmate must exhaust [administrative remedies] irrespective of the forms of relief sought and offered through administrative avenues." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). Under *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378 (2006), exhaustion means proper exhaustion, that is, "a prisoner must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a precondition to bringing suit in federal court." *Id.* at 2384. As long as there is a shared factual basis between the two, perfect overlap between the grievance and a complaint is not required by the PLRA. *See Woodford,* 126 S.Ct. at 2388. The PLRA does not require the grievance and complaint to be identical because inmates are required to complete the applicable administrative process (such as a grievance procedure) even when seeking a form of relief that the prison cannot provide, so long as the prison can afford some sort of relief. *See Booth v. Churner*, 532 U.S. 731 (2001).

The exhaustion requirement is absolute, absent circumstances where no administrative

remedy is available. *See Spruill v. Gillis*, 372 F.3d 218, 227-28 (3d Cir. 2004); *Nyhuis v. Reno*, 204 F.3d 65, 67 (3d Cir. 2000); *but see Freeman v. Snyder,* Civ. No. 98-636-GMS, 2001 WL 515258, at *7 (D. Del. Apr. 10, 2001) (finding that if no administrative remedy is available, the exhaustion requirement need not be met). However, if prison authorities thwart the inmate's efforts to pursue the grievance, administrative remedies may be presumed exhausted, as no further remedies are "available" to him. *Brown v. Croak*, 312 F.3d 109, 112-13 (3d Cir. 2002).

Jenkins avers that except for the date of March 6, 2002, from February 19, 2002 to March 10, 2002 he was denied access to grievance forms of any kind. (D.I. 190, B1.) On that day, Jenkins' disciplinary sanction was to have ended, but he remained in disciplinary housing. He was provided a grievance form, but instructed by a correctional officer that if he mentioned the events of February 19, 2002, the grievance would not be processed. (*Id.* at B2.) Accordingly, Jenkins limited his grievance to release from disciplinary confinement. (*Id.*) The State defendants posit that Jenkins could have timely submitted a grievance regarding the events of February 19, 2002.

Jenkins ultimately submitted an untimely grievance regarding the acts that took place on February 19, 2002. (D.I. 184, A292.) The grievance states that Jenkins was unable to timely file the grievance because he was in the hole and the C/Os would not give him a grievance form. (*Id.* at A292.) A medical grievance on the same date, No. 02-103, referred to the assault. (*Id.* at A293.) Although it was returned as untimely, Jenkins was advised on March 11, 2002, that the matter would be forwarded to Phelps and the Medical Department for review and any action deemed necessary. (*Id.* at A295.) Phelps reviewed the matter and found no indication of excessive use of force. (*Id.* at A296.)

If prison authorities, in fact, thwarted Jenkins efforts to timely file a grievance regarding the actions of the QRT, then his administrative remedies may be presumed exhausted. At this juncture, the facts are in dispute. Accordingly, the court will deny the State defendants' motion for summary judgment on the issue of exhaustion of administrative remedies

### G. Count III, Aiding and Abetting

Count III of the third amended complaint alleges that CMS knew, or should have known, that the State defendants' conduct constituted a breach of a duty owed to Jenkins; that CMS substantially assisted or encouraged the State defendants to deprive Jenkins of his constitutional rights; and that CMS substantially assisted or encouraged the State defendants to commit assault and battery on Jenkins. (D.I.123, ¶¶ 63, 64, 65.)

Civil liability for aiding and abetting tortious conduct stems from the provisions of Restatement Section 876(b). *Anderson v. Airco, Inc.*, Civ.A. 02C-12-091-HDR, 2004 WL 2827887, at *4 (Del. Super Ct. Nov. 30, 2004) (citation omitted). Aiding and abetting focuses on assistance, rather than agreement, and liability is predicated on an independent tortious action. *Id.* (citation omitted). Aiding and abetting liability may flow from negligent conduct. *Id.*

Liability for aiding and abetting requires proof of three elements: underlying tortious conduct, knowledge, and substantial assistance. *Id.*; *see Brug v. Enstar Group, Inc.,* 755 F. Supp. 1247, 1256 (D. Del. 1991). With regard to the second element, mere knowledge is insufficient. *Id.* at *5 (citations omitted). The knowledge element must be coupled with some degree of intent. *Id.* (citations omitted). Additionally, there must be a linkage of knowledge to the third element of liability, that is, providing substantial assistance. *Id.* (citations omitted). There must be a clear nexus between the knowledge of the wrong and the substantial assistance in carrying

-24-

out the wrong. *Patton v. Simone*, Civ.A. 90C-JA-29, 1992 WL 183064 (Del. Super. Ct. June 25, 1992); *see Price v. Halstead*, 355 S.E.2d 380 (W. Va. Supr. 1987) (The complaint alleged the passengers "had substantially contributed to and assisted the driver's continued use of alcohol and drugs before and during the driving while he was already impaired). Inaction can form the basis of aiding and abetting liability if it rises to the level of providing substantial assistance or encouragement. *See Failla v. City of Passaic*, 146 F.3d 149, 158 n.11 (3d Cir. 1998).

Six factors are considered to determine if substantial assistance has been provided. *Id.* (citations omitted). They include: (1) the nature of the act encouraged, (2) the amount and kind of assistance given, (3) the defendant's absence or presence at the time of the tort, (4) the relationship to the tortious actor, (5) the defendant's state of mind, and (6) the duration of the assistance. *Id.*

CMS argues that Jenkins has failed to satisfy the elements of aiding and abetting. Jenkins argues that CMS' decision to ignore Jenkins' complaints, denial of medical care, and failure to inform others of his reports assisted the State defendants' attack on Jenkins "after the fact." (D.I. 189, at 42.) Jenkins cannot escape the fact that nothing in the record supports a finding that CMS had knowledge of the actions of the State defendants before and/or during the acts that took place on February 19, 2002. It is clear from the record that CMS, through its employees, did not learn of the State defendants' actions until after they took place. Moreover, the record does not support a finding of substantial assistance to the State defendants. For example, the record does not indicate that CMS encouraged the State defendants' actions, that it provided assistance to the State defendants, or that it was present at the time of the State defendants' actions. And, while Jenkins complains of medical care, the record indicates that he

-25-

was seen by medical staff very close in time to the acts of the State defendants. It is evident from the record, that CMS did not provide substantial assistance or encouragement to the State defendants in carrying out their alleged tortious acts. Accordingly, the court will grant CMS' motion for summary judgment.

## V.    CONCLUSION

For the above stated reasons the court will grant in part and deny in part the State defendants' motion for summary judgment. The court will grant CMS' motion for summary judgment. There are no claims remaining against Warden Williams, Miller, Burrell, and CMS. The case will proceed against the remaining State defendants on Counts I and II, the excessive force and failure to intervene claims and the assault and battery claim solely as to the 1E pod incident. An appropriate order will be entered.

CHIEF, UNITED STATES DISTRICT JUDGE

_____, 2008
Wilmington, Delaware

-26-

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

JOE R. JENKINS,                  )
                                          )
           Plaintiff,          )
                                          )
      v.                        ) Civil Action No. 02-331-GMS
                                          )
RAPHAEL WILLIAMS, et al.,     )
                                          )
          Defendants.      )

**ORDER**

At Wilmington this 7ᵗʰ day of _____ May _____, 2008, for the reasons set forth in the Memorandum issued this date;

1.  The State defendants' motion for summary judgment is **granted** as to the claims raised against Warden Williams, Michael Miller, and Charles Burrell, the excessive force claim, failure to intervene claim, and State Tort Claims Act immunity on the events leading up to the extraction, the extraction itself, the trip to the infirmary, and prior to the 1E pod incident, as well as the deliberate indifference to Jenkins' health or safety claim, and is **denied** in all other respects. (D.I. 182.)

2.  Correctional Medical Services' motion for summary judgment is **granted**. (D.I. 185.)

3.  The case will proceed against the remaining State defendants Lewis, Yingling, Buff, Cerisier, Austin, Poole, Kearns, and R. Talenti solely as to the 1E pod incident as set forth in Counts I and II - the excessive force, failure to intervene, and assault and battery claims.

CHIEF, UNITED STATES DISTRICT JUDGE